UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


CESPREGI POINDEXTER,

                Petitioner,                             Hon. Wendell A. Miles

v.                                             Case No. 1:05-CV-833

KURT JONES,

                Respondent.

_____/


## REPORT AND RECOMMENDATION

This matter is before the Court on Poindexter's petition for writ of habeas corpus. In accordance with 28 U.S.C. § 636(b) authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of prisoner petitions, the undersigned recommends that Poindexter's petition be **denied**.


## BACKGROUND

As a result of events which occurred from February 17, 2000, through February 21, 2000, Petitioner was charged with: (1) two counts of third degree criminal sexual conduct; (2) assault with the intent to commit great bodily harm less than murder; (3) two counts of assault with a dangerous weapon; (4) extortion; and (5) possession of a firearm during the commission of a felony. (Trial Transcript at 21-23). Several individuals testified at Petitioner's jury trial. The relevant portions of their testimony are summarized below.

1

**Teresa Poindexter**

Teresa Poindexter married Petitioner in 1997. (Tr. 121-23). As of February 17, 2000, Teresa Poindexter resided in Battle Creek with Petitioner and his three children from a previous relationship. (Tr. 121-22).

At approximately 4:30 p.m. on February 17, 2000, Petitioner picked up Poindexter from work. (Tr. 123). On the drive home, Petitioner asked Poindexter why her hair was "messed up" and "out of place." (Tr. 124-25). Petitioner stated that he thought Poindexter was "messing around" with somebody. (Tr. 127). When Poindexter responded that she "wasn't messing around with anybody," Petitioner "grabbed" and "pulled" her hair. (Tr. 125-27). Petitioner then stated to Poindexter, in a loud and angry voice, "when we get home I'm going to beat your mother fucking ass." (Tr. 127).

Poindexter testified that Petitioner had installed around their residence a wire fence (approximately five feet in height) with a gate, which he kept chained and padlocked. (Tr. 128-29). Poindexter did not have a key to unlock the gate. (Tr. 129, 198). Moreover, because Poindexter had recently undergone back surgery, she was unable to climb over the fence. (Tr. 203). After they arrived home, Petitioner locked the gate behind them. (Tr. 129).

Upon entering the house, Poindexter began walking up a flight of stairs. (Tr. 128-30). Petitioner trailed behind Poindexter and began hitting her. (Tr. 128-30). Petitioner struck Poindexter with his fist "several times" in the head and side, knocking her down. (Tr. 130-32). As he was striking Poindexter, Petitioner kept demanding to know who she was "messing around with." (Tr. 131). Poindexter continued up the stairs and entered her bedroom. (Tr. 132-33).

Petitioner followed Poindexter into the bedroom and told her, "get your clothes and

2

get out of here." (Tr. 133-35).  Petitioner told Poindexter to leave because he thought that she was "messing around with somebody." (Tr. 136).  Poindexter denied these accusations, but Petitioner did not believe her.  (Tr. 136).  Petitioner told Poindexter that "he had knew of somebody that had told him that [she] was supposed to have been messing around." (Tr. 136).  Poindexter was "too afraid" to get any of her clothes for fear of what Petitioner "might do next." (Tr. 136).  When Poindexter failed to leave, Petitioner told her, "carry your ass downstairs and cook my kids something to eat." (Tr. 136).

Poindexter went downstairs and began cooking. (Tr. 137).  While she was doing this, Petitioner kept asking her who she was "messing around with." (Tr. 137).  Poindexter responded, "no one." (Tr. 137).  Petitioner then told Poindexter, "you better answer me because if I go get this person that told me you was messing around with, bitch, I'm going to kick your ass right in front of 'em." (Tr. 137).  Petitioner kept "drawing his fist up" and yelling, "tell me who you's messing around with." (Tr. 137).  Because she was afraid of being beaten again, Poindexter began "making up names." (Tr. 137-39).  Petitioner responded by striking Poindexter with his fists four or five times in the head. (Tr. 139).  This attack knocked Poindexter to the floor, at which point Petitioner began kicking her. (Tr. 139).  Petitioner eventually relented so that Poindexter could serve the food. (Tr. 140).  As Petitioner ate, he told Poindexter, "this is not over with yet so you better hurry up and get up out of the kitchen." (Tr. 140-41).

After Petitioner finished eating, he and Poindexter returned to the bedroom where Petitioner "kept asking [her] over and over again who was [she] messing around with." (Tr. 141-42).  Poindexter again told Petitioner that she was not "messing around" with anybody, at which point Petitioner starting beating Poindexter in the head "non-stop" with his fists. (Tr. 142-43).  Poindexter

3

testified that "it seemed like I had at least thirty blows to my face."  (Tr. 143).

After beating Poindexter, Petitioner said, "bitch, you better tell me who you was messing around with."  (Tr. 143).   When Poindexter repeated that she had not been "messing around" with anybody, Petitioner entered the closet and retrieved a rifle.  (Tr. 143-44).  Petitioner then pointed the weapon at Poindexter and told her, "if you don't tell me who you been messing around with, bitch, I'm going to kill you."  (Tr. 144-48).  Petitioner then loaded ammunition in the weapon.  (Tr. 144-48).  Poindexter stood up, but was afraid to run out of the room.  (Tr. 146-47).  Petitioner then struck Poindexter in the face with the rifle, knocking out two of her front teeth.  (Tr. 147-50, 153).  Poindexter fell to the floor, at which point Petitioner began choking her.  (Tr. 151-52).  When he was finished choking Poindexter, Petitioner told her

> Now you ugly enough.  I done fucked you up enough.  Now no other nigger's gonna want you.  Get up off the floor.

(Tr. 152).

Petitioner then told Poindexter, "you need to get something to stop that bleeding on your face."  (Tr. 152-58).  Petitioner then put some ice in a towel and told Poindexter to hold it to her face.  (Tr. 158).  While Poindexter was doing this, Petitioner told her to "take your clothes off." (Tr. 158).  Poindexter asked Petitioner, "don't you think I need to go to the hospital with this cut?" (Tr. 160-61).  Petitioner responded, "no, you ain't going - - I'm not going to take you to the hospital so you can report me that I done this mess to you."  (Tr. 161).  Because she was too scared to try and leave the house by herself, Poindexter urged Petitioner to take her to the hospital, but Petitioner simply stated that, "I should have killed you."  (Tr. 161).  Petitioner then told Poindexter, "I'm not going to tell you no more you better take your clothes off. . .take your clothes off otherwise I'm

going to beat your ass again."  (Tr. 161-62).

Poindexter unwillingly complied with Petitioner's request.  (Tr. 162).  Petitioner then forced Poindexter to have sexual intercourse.  (Tr. 162-64).  Petitioner then began to question Poindexter "about what [she] had done with the other guys."  (Tr. 164).  When Poindexter denied having sex with anybody else, Petitioner "crawled" onto Poindexter's face and urinated in her mouth.  (Tr. 164).  While this was occurring Poindexter was afraid that if she "tried to even get up or do anything" Petitioner would shoot her.  (Tr. 164).  Petitioner and Poindexter soon thereafter fell asleep.  (Tr. 164-66).

The following morning Petitioner told Poindexter that she was "going to be locked up in this house for a couple of days."  (Tr. 167).  Petitioner told Poindexter to telephone her supervisor and "make up some type of story" explaining why she was unable to go to work.  (Tr. 167-68).  Petitioner told Poindexter that if she "said anything wrong, you know what I'm going to do to you."  (Tr. 169).  Poindexter told her supervisor that she had been in a car accident.  (Tr. 168-70).  Later that day, Petitioner drove Poindexter to the bank and grocery store.  (Tr. 173-77, 189-90).

Early the next day, Petitioner said to Poindexter "I ain't through with you yet. . .I want to talk to you."  (Tr. 171, 190).  Petitioner, who was holding a "little steak knife," then asked Poindexter, "now, who is this - this housekeeper dude you supposed to be messing around with?"  (Tr. 171, 190-91).  Poindexter responded that she was "not messing around with no housekeeper."  (Tr. 171, 190-91).  Petitioner then told Poindexter, "now you have a choice. . .you have a choice of cutting your neck, cut your tongue out or shit in your mouth."  (Tr. 171-72, 190-91).  Poindexter told Petitioner, "I don't want none of it done to me."  (Tr. 172, 190-91).  Petitioner then tossed the knife on a table and hit Poindexter in the head.  (Tr. 172, 191).  Petitioner later departed the residence,

5

taking the telephones with him.  (Tr. 191-93).

The following day Petitioner told Poindexter "if I go back out here in the street tonight and if any of these niggers tell me that you have been messing around with someone out there I'm going to come back [and] commence knocking the rest of your mother fucking teeth out of your mouth."  (Tr. 199).  Petitioner departed the residence later that afternoon, but did not take the telephones with him, enabling Poindexter to telephone the police.  (Tr. 200-01).  The police arrived soon thereafter and freed Poindexter by cutting the padlock on the gate to Poindexter's residence. (Tr. 203-04).  Poindexter was then taken to a hospital for treatment.  (Tr. 206).

**Cespregi Poindexter, Jr.**

Petitioner's son, Cespregi Poindexter, Jr., testified that he was nine years of age.  (Tr. 272).  Poindexter testified that on February 17, 2000, he witnessed his dad and step-mom arguing in their bedroom.  (Tr. 276-80).  Poindexter testified that he witnessed his step-mom, Teresa Poindexter, kick his dad "between the legs." (Tr. 281).  Teresa Poindexter then ran to the closet and "got the gun" and told Petitioner, "I'm going to kill you." (Tr. 281).  Petitioner attempted to wrestle the gun away from Teresa Poindexter.  (Tr. 282).  Petitioner then told his son to "get out of the way" and "go downstairs." (Tr. 282).  Poindexter went downstairs, but could hear his dad and step-mom continue to argue.  (Tr. 283).

**Rebecca Garcia**

Garcia testified that she worked with Teresa Poindexter.  (Tr. 299).  On the morning of February 18, 2000, Garcia spoke with Poindexter.  (Tr. 300).  Poindexter informed Garcia that she

6

could not come to work that day because she had been in a car accident.  (Tr. 300-01).  Garcia testified that Poindexter sounded "very nervous and shaky."  (Tr. 301).

**Dr. Thomas Maier**

Dr. Maier examined Teresa Poindexter in the Battle Creek Health Services Emergency Room on the evening of February 21, 2000.  (Tr. 304-05).  This examination revealed that Poindexter had suffered the following injuries: black eyes, redness to the white part of the right eye, laceration in the right nasal labial fold, and laceration in the upper inside of the left lip.  (Tr. 306).  Poindexter reported that her injuries were the result of "being struck with fists." (Tr. 306-07).  Dr. Maier testified that Poindexter's injuries were consistent with that description.  (Tr. 307).  After receiving treatment for these injuries, Poindexter was taken to the Fieldstone Center to undergo a sexual assault examination.  (Tr. 307-08).

**Robert Cipcic**

As of February 21, 2000, Cipcic was employed with the Battle Creek Police Department.  (Tr. 311).  At approximately 5:00 p.m. that afternoon, Officer Cipcic was dispatched to Teresa Poindexter's residence.  (Tr. 311-14).  Cipcic observed that the house was surrounded by a chain link fence and a gate that was secured by a heavy chain and padlock.  (Tr. 312-14).

While Cipcic was waiting for a backup officer to arrive, Teresa Poindexter exited the residence.  (Tr. 314).  Officer Cipcic immediately observed that Poindexter "appeared to have been assaulted."  (Tr. 314).  Cipcic observed that Poindexter had suffered "severe facial injuries."  (Tr. 314).  He also observed that Poindexter was walking "gently as if she had some type of pain either

in the legs or lower abdomen area." (Tr. 314).  Officer Cipcic observed that Poindexter's face was lacerated and "extremely swollen" and that her right eye "had a large amount of blood inside the white part of the eye and it was tearing slightly with a red liquid." (Tr. 324).  Cipcic also observed that Poindexter's front teeth were missing.  (Tr. 325).

Poindexter told Officer Cipcic that he "needed to get her out of the house and out of the yard." (Tr. 314).  When Cipcic asked Poindexter if she had "a key for the gate," she responded that she did not. (Tr. 314).  Officer Cipcic then cut the lock off the front gate with bolt cutters.  (Tr. 314-15).  After obtaining consent, Officer Cipcic searched the residence.  (Tr. 317-18).  Cipcic observed that the bedroom "was in disarrange" with blood on a pillow case and clothes laying on the floor.  (Tr. 321).  Officer Cipcic observed that the bed linen was blood stained.  (Tr. 321).  Cipcic also retrieved a "long gun" from the closet.  (Tr. 322).

**Phyllis VanOrder**

As of February 21, 2000, VanOrder was employed by the Battle Creek Health System as an Assault Nurse Examiner for Sexual Assault Services.  (Tr. 332-35).  On that date, VanOrder examined Teresa Poindexter at the Fieldstone Center.  (Tr. 335-36).  This examination revealed discoloration under both of Poindexter's eyes, as well as reddening of the white portion of her right eye.  (Tr. 337).  VanOrder also observed "trauma" and "large bruised areas" on Poindexter's arms as well as bruising and scratches on her chest.  (Tr. 338).  An examination of Poindexter's genitals revealed "redness" and "exquisite" tenderness.  (Tr. 338-39).

8

**Cheryle Poindexter**

Poindexter testified that she thought she was ten years old, but that she was not sure. (Tr. 340). Poindexter testified that she remembered an incident that occurred earlier that year in which her dad (Petitioner) and her step-mom (Teresa Poindexter) got into a fight in their bedroom. (Tr. 342-44). Poindexter testified that she saw her dad and step-mom fighting to gain control of a shotgun. (Tr. 344-47). Poindexter also testified that her dad and step-mom were "hitting each other." (Tr. 352-53). Poindexter witnessed her dad hit her step-mom with his fist. (Tr. 353).

Following a jury trial, Petitioner was acquitted of both counts of assault with a dangerous weapon and possession of a firearm during the commission of a felony. (Tr. 21-23, 443-44). Petitioner was convicted of two counts of third degree criminal sexual conduct, extortion, and assault with the intent to commit great bodily harm less than murder. (Tr. 21-23, 443-44). Petitioner was also convicted of being an habitual offender. (Dkt. #27). Petitioner was sentenced to the following concurrent terms of imprisonment: (a) 107-270 months for each of the criminal sexual conduct convictions; (b) 71-180 months for the assault with the intent to commit great bodily harm less than murder conviction; and (c) 118-360 months for the extortion conviction. (Sentencing Transcript, July 31, 2000, 14-23). Petitioner appealed his conviction to the Michigan Court of Appeals asserting the following claims:

> I.  Mr. Poindexter's convictions must be vacated because the prosecution produced insufficient evidence that the crimes were committed.
>
> II.  Mr. Poindexter's constitutional right to counsel under the federal and state constitutions was denied where the trial court neglected or ignored his request for court appointed trial counsel.

9

III.    Mr. Poindexter's constitutional right to the effective assistance of counsel under the federal and state constitutions was denied where counsel made several big mistakes effecting the outcome of the trial.

IV.    Defendant's sentence violates the principle of proportionality under the record presented where it falls within the Michigan sentencing guidelines range, but the guidelines range is incorrectly calculated.

The Michigan Court of Appeals affirmed Petitioner's conviction. *People v. Poindexter*, No. 229096, Opinion (Mich. Ct. App., Nov. 15, 2002). Asserting the following claims, Petitioner moved in the Michigan Supreme Court for leave to appeal:

I.    Mr. Poindexter's convictions must be vacated because the prosecution produced insufficient evidence that the crimes were committed.

II.    Defendant's convictional (sic) right to counsel under the federal and state constitutions was denied where the trial court neglected or ignored his request for court appointed trial counsel.

III.    Defendant's constitutional right to effective assistance of counsel under the federal and state constitutions was denied where counsel made several big mistakes effecting the outcome of the trial.

IV.    Defendant's sentence violates the principle of proportionality under the record presented where it falls within the Michigan guidelines range, but the guidelines range is incorrectly calculated.

V.    Defendant was denied effective assistance of appellate counsel under federal law, thus denying his sixth amendment rights and requiring this court to reinstate the appeal of right.

The court denied Petitioner's request for leave to appeal, stating that "we are not persuaded that the questions presented should be reviewed by this Court." *People v. Poindexter*, No.

10

122896, Order (Mich., May 30, 2003). Petitioner later submitted in the trial court a motion for relief

from judgment in which he asserted the following claims:

> I.    Defendant-Appellant was denied the effective assistance of appellate counsel on appeal of right where appellate counsel's performance fell below an objective standard of reasonableness resulting in prejudice to the Defendant where appellant counsel on Defendant's appeal merely presented a laundry list of ways in which trial counsel was allegedly ineffective; failed to provide supporting arguments for his claims; and failed to provide citations to the record or provide the factual basis for his claims.

> II.   Defendant-Appellant was denied his state and federal constitutional right to due process and a fair trial where the prosecutor engaged in misconduct when he sought to bolster the testimony of the victim of the alleged criminal sexual conduct by asking the victim why should the jury believe her that Defendant did violent acts to her; and interjected into his closing argument the jury's religious duty in calling for conviction.

> III.  Defendant was deprived of his state and federal constitutional right to the effective assistance of counsel and a fair trial under both state and federal constitutions where defense counsel failed to conduct a proper pretrial investigation, failed to interview a crucial witness, failed to present a complete and meaningful defense, failed to lodge an objection to prosecutorial misconduct, and failed to convey a possible plea offer.

Concluding that Petitioner was not entitled to relief pursuant to MCR 6.508(D), the

trial court denied Petitioner's request for relief. *People v. Poindexter*, No. 00-1218-FH, Opinion

(Calhoun Cnty. Cir. Ct., Apr. 22, 2004). Asserting the same three claims, Petitioner moved in the

Michigan Court of Appeals for leave to appeal. The Michigan Court of Appeals denied Petitioner's

request "for failure to meet the burden of establishing entitlement to relief under MCR 6.508(D)."

*People v. Poindexter*, No. 256073, Order (Mich. Ct. App., Jan. 3, 2005).  Asserting the following

claims, Petitioner moved in the Michigan Supreme Court for leave to appeal:

> I.   Defendant-Appellant was denied the effective assistance of appellate counsel on appeal of right where appellate counsel performance fell below an objective standard of reasonableness resulting in prejudice to the Defendant where appellant counsel on Defendant's appeal merely presented a laundry list of ways in which trial counsel was allegedly ineffective; failed to provide supporting arguments for his claims; and failed to provide citations to the record or provide the factual basis for his claims.
>
> II.  Defendant-Appellant was denied his state and federal rights under the constitution to due process and a fair trial where the prosecutor engaged in misconduct when he sought to bolster the testimony of the victim of the alleged criminal sexual conduct by asking the victim why should the jury believe her that the Defendant did violent acts to her; and interjected into his closing argument the jury's religious duty in calling for conviction.
>
> III. Defendant was deprived of his state and federal constitutional right to the effective assistance of counsel and a fair trial where defense counsel failed to conduct a proper pretrial investigation, failed to interview a crucial witness, failed to present a complete and meaningful defense, failed to lodge an objection to prosecutorial misconduct, and failed to convey a possible plea offer.
>
> IV.  The trial court's refusal to grant Defendant's motion for an evidentiary hearing denied Defendant a record of sufficient completeness to permit proper consideration of his ineffective assistance of both trial and appellate counsel claims.

The court denied Petitioner's request for leave to appeal "because the defendant has failed to meet the burden of establishing entitlement to relief under MCR 6.508(D)." *People v. Poindexter*, No. 127867, Order (Mich., Nov. 29, 2005). On December 15, 2005, Petitioner initiated the present action in which he asserts the following claims:[1]

> I. Defendant-Appellant was denied the effective assistance of appellate counsel on appeal of right where appellate counsel performance fell below an objective standard of reasonableness resulting in prejudice to the Defendant where appellant counsel on Defendant's appeal merely presented a laundry list of ways in which trial counsel was allegedly ineffective; failed to provide supporting arguments for his claims; and failed to provide citations to the record or provide the factual basis for his claims.

> II. Defendant-Appellant was denied his state and federal rights under the constitution to due process and a fair trial where the prosecutor engaged in misconduct when he sought to bolster the testimony of the victim of the alleged criminal sexual conduct by asking the victim why should the jury believe her that the Defendant did violent acts to her; and interjected into his closing argument the jury's religious duty in calling for conviction.

> III. Defendant was deprived of his state and federal constitutional right to the effective assistance of counsel and a fair trial where defense counsel failed to conduct a proper pretrial investigation, failed to interview a crucial witness, failed to present a complete and meaningful defense, failed to lodge an objection to prosecutorial misconduct, and failed to convey a possible plea offer.

> IV. The trial court's refusal to grant Defendant's motion for an evidentiary hearing denied Defendant a record

---

[1] While Petitioner identified only four claims on the habeas petition form, (dkt. #1), in his <u>Brief in Support of Petition</u>, (dkt. #1), Petitioner asserted the following six claims.

of sufficient completeness to permit proper consideration of his ineffective assistance of both trial and appellate counsel claims.

V.      Whether Poindexter was denied a fair trial that permitted the prosecutor to introduce hearsay statements from a witness that could not be cross-examined, that was never testified to.  Allowing false testimony to sway the jury in favor of the court.  In direct violation of Sixth Amendment right.  Crawford completely bars the prosecution from introducing a "testimonial" statement, even if it falls within a hearsay exception and even if the statement is reliable.  Otherwise the defendant would have been aquitted of the over charge.

VI.     Whether the Blakely error is a structural error requiring automatic reversal of enhanced sentence.  The Blakely opinion, the court noted, did not explicitly identify the standard of review.  Instead, the opinion states: "Sixth Amendment petitioners sentence is invalid", indicates that when a judge imposes an exceptional sentence not based on the facts reflected in jury verdict or admitted by the defendant, the court commits "fatal error."

## STANDARD OF REVIEW

Poindexter's petition is subject to the provisions of the Antiterrorism and Effective Death Penalty Act (AEDPA), as it amended 28 U.S.C. § 2254.  The AEDPA amended the substantive standards for granting habeas relief under the following provisions:

(d)     An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —

(1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established

14

Federal law, as determined by the Supreme Court of the United States, or

(2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The AEDPA has "modified" the role of the federal courts in habeas proceedings to "prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002).

Pursuant to § 2254(d)(1), a decision is "contrary to" clearly established federal law when "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000); *see also, Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).

Prior to *Williams*, the Sixth Circuit interpreted the "unreasonable application" clause of § 2254(d)(1) as precluding habeas relief unless the state court's decision was "so clearly incorrect that it would not be debatable among reasonable jurists." *Gordon v. Kelly*, 2000 WL 145144 at *4 (6th Cir., February 1, 2000); *see also, Blanton v. Elo*, 186 F.3d 712, 714-15 (6th Cir. 1999).  The *Williams* Court rejected this standard, indicating that it improperly transformed the "unreasonable application" examination into a subjective inquiry turning on whether "at least one of the Nation's jurists has applied the relevant federal law in the same manner" as did the state court. *Williams*, 529 U.S. at 409.

In articulating the proper standard, the Court held that a writ may not issue simply

15

because the reviewing court "concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams,* 529 U.S. at 411. Rather, the Court must also find the state court's application thereof to be *objectively* unreasonable. *Bell*, 535 U.S. at 694; *Williams*, 529 U.S. at 409-12. Accordingly, a state court unreasonably applies clearly established federal law if it "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular. . .case" or "if the state court either unreasonably extends a legal principle from [the Supreme Court's] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Lancaster*, 324 F.3d at 429 (quoting *Williams*, 529 U.S. at 407).

Furthermore, for a writ to issue, the Court must find a violation of Supreme Court authority. The Court cannot look to lower federal court decisions in determining whether the relevant state court decision was contrary to, or involved an unreasonable application of, clearly established Federal law. *See Harris v. Stovall*, 212 F.3d 940, 943-44 (6th Cir. 2000).

Pursuant to 28 U.S.C. § 2254(d)(2), when reviewing whether the decision of the state court was based on an unreasonable determination of the facts in light of the evidence presented, the factual findings of the state court are presumed to be correct. *See Warren v. Smith*, 161 F.3d 358, 360 (6th Cir. 1998) (citing 28 U.S.C. § 2254(e)(1)). Petitioner can rebut this presumption only by clear and convincing evidence. *Id.*

## ANALYSIS

### I.       Ineffective Assistance of Trial Counsel

Petitioner asserts that his conviction must be vacated because his trial counsel's performance served to deprive Petitioner of his Sixth Amendment right to the effective assistance of counsel. Specifically, Petitioner has identified six separate errors allegedly made by his trial counsel. As discussed below, Petitioner has procedurally defaulted these claims. However, even addressed on the merits, these claims do not entitle Petitioner to relief.

Under the procedural default doctrine, federal habeas review is barred where a state court declined to address Petitioner's claims because of a failure to satisfy state procedural requirements. *See Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991). Where Petitioner's claims have been procedurally defaulted, the state court judgment rests on an independent and adequate state ground precluding review by a federal court. *See Coleman*, 501 U.S. at 750-51; *Wainwright v. Sykes*, 433 U.S. 72, 81 (1977); *Harris v. Reed*, 489 U.S. 255, 262 (1989).

The Sixth Circuit employs a multi-part test to determine if a petitioner has procedurally defaulted a particular issue: (1) there must exist a state procedural rule that is applicable to the claim and with which the petitioner failed to comply, (2) the state court must have actually enforced the state procedural rule, and (3) the default must constitute an "independent and adequate" state ground on which the state can rely to foreclose review of a federal constitutional claim. *See Williams v. Bagley*, 380 F.3d 932, 966 (6th Cir. 2004).

It must be remembered, however, that for the procedural default doctrine to apply, "the last state court rendering a judgment in the case must have based its judgment on the procedural default." *Simpson v. Jones*, 238 F.3d 399, 406 (6th Cir. 2000). Furthermore, review by a state court

of a procedurally defaulted claim to prevent manifest injustice does not constitute a review on the merits sufficient to excuse procedural default. *See Lundgren v. Mitchell*, 440 F.3d 754, 765 (6th Cir. 2006) ("a state court's plain error analysis does not save a petitioner from procedural default").

If Petitioner has procedurally defaulted a particular claim, federal habeas review is available only if he can establish either (1) the existence of cause for his default and actual prejudice resulting therefrom, or (2) that the failure to consider the merits of the claim will result in a fundamental miscarriage of justice. *See Bagley*, 380 F.3d at 966 (citing *Coleman*, 501 U.S. at 750).

With respect to cause, Petitioner must demonstrate the existence of some objective factor, external to the defense, which impeded his efforts to comply with the applicable procedural rule. *See Murray v. Carrier*, 477 U.S. 478, 488 (1986); *Johnson v. Wilson*, 187 Fed. Appx. 455, 458 (6th Cir., June 16, 2006). To establish that a miscarriage of justice would result from the failure to review his procedurally defaulted claims, Petitioner must make a "colorable showing of factual innocence." *McCleskey v. Zant*, 499 U.S. 467, 495 (1991). To satisfy this requirement Petitioner must demonstrate the existence of new and reliable evidence, not presented at trial, which establishes that some constitutional error "probably resulted" in the conviction of an innocent person. *See Schlup v. Delo*, 513 U.S. 298, 324-27 (1995). The evidence must show that it is "more likely than not that no reasonable juror would have convicted him in light of the new evidence." *Id.* at 326-27.

Michigan Court Rule 6.508 provides that a defendant may not collaterally attack a conviction based upon claims that were decided against him in a prior appeal or that could have been raised in a prior appeal. M.C.R. 6.508(D)(2)-(3). With respect to claims which could have been raised in a prior appeal, a defendant is entitled to relief only if he can establish both "good cause" for failing to assert the issue previously and "actual prejudice" resulting therefrom. M.C.R.

18

6.508(D)(3).  In this context, "actual prejudice" is defined as a "reasonably likely chance of acquittal" or an "irregularity so offensive to the maintenance of a sound judicial process that the conviction should not be allowed to stand."  M.C.R. 6.508(D)(3)(a)-(b).

The Sixth Circuit has held that denial of leave to appeal on the basis that a petitioner "failed to meet the burden of establishing entitlement to relief under MCR 6.508(D)," constitutes a sufficient determination that the court's conclusion was based on procedural default. *See Burroughs v. Makowski*, 282 F.3d 410, 414 (6th Cir. 2002).  Furthermore, Rule 6.508(D), regularly followed since 1990, constitutes an independent and adequate state ground, the reliance on which precludes federal review of those issues against which it is applied.  *Simpson*, 238 F.3d at 407.

Petitioner did not assert in his direct appeal as of right the specific ineffective assistance of counsel claims asserted in his petition for writ of habeas corpus.  Instead, Petitioner first asserted these particular claims in his post-conviction attempts to obtain relief.  As previously noted, however, Petitioner's attempts to obtain post-conviction relief were denied because of his failure to comply with Michigan Court Rule 6.508(D).  Thus, Petitioner has procedurally defaulted such claims.  Petitioner has demonstrated neither cause for his default nor prejudice resulting therefrom.  Petitioner has also failed to establish that a fundamental miscarriage of justice would result from the Court's failure to review the merits of these claims.  Thus, the Court is precluded from reviewing the merits of Petitioner's ineffective assistance of counsel claims.  Furthermore, even examined on the merits, such claims are without merit.

To establish that he was denied the right to the effective assistance of counsel, Petitioner must establish that his counsel's performance was so deficient that he was not functioning as the "counsel" guaranteed by the Sixth Amendment.  *Strickland v. Washington*, 466 U.S. 668, 687

19

(1984).  Accordingly, Petitioner must demonstrate that his attorney's actions were unreasonable under prevailing professional norms.  *Id.* at 688.  In assessing such a claim, however, the Court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the [Petitioner] must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'"  *Id.* at 689.

Petitioner must further establish that he suffered prejudice as a result of his attorney's allegedly deficient performance.  Prejudice, in this context, has been defined as "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Mahdi v. Bagley*, 522 F.3d 631, 636 (6th Cir. 2008).  This is a heavy burden for Petitioner to meet, because he must establish that his counsel's performance was "so manifestly ineffective that defeat was snatched from the hands of probable victory."  *Jacobs v. Mohr*, 265 F.3d 407, 418 (6th Cir. 2001).

A.    Failure to Conduct Proper Pretrial Investigations

Petitioner asserts that "he was denied effective assistance of counsel based upon trial counsel's failure to discover that there exist prior proceedings arising out of the same conduct that had been instituted against defendant which might have been used for impeachment purposes." (Dkt. #1, Part 3 at 27).[2]  Petitioner further asserts that "he advised trial counsel prior to trial that although he could not remember the exact date, that there exist court records of the same conduct lodged against him, regarding the same complainant." (Dkt. #1, Part 3 at 27).  Petitioner claims that trial

---

[2]  This citation refers to Petitioner's Brief in Support of Petition.  The page citations refer to the Court's CM/ECF numbering, located in the upper right hand corner of each page.

counsel rendered ineffective assistance by his failure to investigate this information.

Even were the Court to find that counsel's failure constituted deficient performance, Petitioner cannot demonstrate that he was prejudiced by such. Petitioner has provided no information regarding this alleged "prior proceeding." He has failed to describe or explain how such "might have been used for impeachment purposes" or otherwise have proved beneficial at his trial. Simply put, Petitioner cannot demonstrate that this alleged failure by his attorney deprived him of the right to the effective assistance of counsel.

B.      Failure to Interview a Crucial Witness

Petitioner asserts that prior to trial he advised his attorney "that the complainant had mental health problems and had been treated for such." (Dkt. #1, Part 3 at 28). Petitioner asserts that his attorney failed "to interview the victim's psychologist or conduct an in camera review of the victim's psychotherapy records," thereby depriving him of the right to the effective assistance of counsel. (Dkt. #1, Part 3 at 28-29).

Again, even if counsel's performance in this regard was deficient, Petitioner has failed to establish that he was prejudiced by such. Petitioner has submitted no evidence indicating what beneficial information his attorney might have obtained by interviewing Poindexter's psychologist or reviewing her psychotherapy records. Thus, Petitioner cannot demonstrate that there exists a "reasonable probability" that but for counsel's alleged shortcoming the outcome of his trial would have been different. Thus, Petitioner cannot demonstrate that this alleged failure by his counsel deprived him of the right to the effective assistance of counsel.

C.      Failure to Object to the Prosecutor Bolstering the Credibility of a Witness

During the prosecutor's re-direct examination of Teresa Poindexter the following exchange occurred:

> Q:      Do you see this gentleman sitting here today and he
> appears very calm?  Why should this jury believe you
> that he did these - these - what you've testified to as
> violent acts?
>
> A:      For the simple reason because what he done - what he
> done to me, first of all, was not right.  I was there with
> Cespregi.  He was my husband and I never thought
> that it would go this far for him to physically beat me
> like this.  It hurts.  It just hurts.  It just hurts.

(Trial Transcript at 267).

Petitioner asserts that this exchange constitutes an attempt by the prosecutor to improperly bolster the victim's credibility.  (Dkt. #1, Part 3 at 32-33).  Petitioner claims that his attorney's failure to object to the prosecutor's question constitutes ineffective assistance.  (Dkt. #1, Part 3 at 32-33).

It is improper for a prosecutor to comment on the credibility of a witness or express a personal belief regarding a witness' veracity.  *See Hodge v. Hurley*, 426 F.3d 368, 378 (6th Cir. 2005).  Improper vouching occurs when a jury could "reasonably believe that the prosecutor was indicating a personal belief in a witness' credibility."  *Taylor v. United States*, 985 F.2d 844, 846 (6th Cir. 1993).  The prosecutor in this instance did not comment on Teresa Poindexter's credibility or express a personal belief regarding her truthfulness.  Instead, in response to Petitioner's cross-examination, which challenged Poindexter's credibility and the truthfulness of her testimony, the prosecutor simply asked Poindexter why the jury should believe her version of events.  The Court

22

discerns nothing improper about the prosecutor's question.  Thus, counsel was not ineffective for failing to object to such.

> D.     Failure to Object to Prosecutor's Closing Argument

In his closing argument, the prosecutor made the following comments:

> Ladies and Gentlemen, I said in my opening that we wanted to focus on the actions of the defendant.  Some of the testimony you heard over the last couple of days was about why the victim did what she did and I stated that that's not the reason we're here.  The reason we're here is because of what it's alleged that the defendant did.  The defense counsel stood up and said no, that's not exactly right.  We're here because of what I did.  I brought them here.[3]  That's giving me a little too much credit in my opinion, but after hearing this testimony I hope there's a part of you that says, "Thank God."  "Thank God we're here."  "Thank God we get to decide on these charges."

(Trial Transcript at 376-77).

Petitioner asserts that these comments were improper and this his attorney's failure to object thereto deprived him of the right to the effective assistance of counsel.  (Dkt. #1, Part 3 at 33-36).

As is well recognized, "[w]hen a petitioner makes a claim of prosecutorial misconduct, 'the touchstone of due process analysis...is the fairness of the trial, not the culpability of the prosecutor.'"  *Serra v. Michigan Dep't of Corrections*, 4 F.3d 1348, 1355 (6th Cir. 1993)

---

[3]   In his opening statement to the jury, defense counsel made the following comments:

Ladies and Gentlemen of the jury, I - I can't argue now but I'll tell you that the reason we're here is not because of what the defendant did in February of 19 - or the year 2000.  We're here because the prosecutor has brought a charge and has brought an allegation and has now stood in front of you and told you - told you what he's going to prove.

(Trial Transcript at 118).

(quoting *Smith v. Phillips*, 455 U.S. 209, 219 (1982)).  The issue is whether the prosecutor's conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Gillard v. Mitchell*, 445 F.3d 883, 897 (6th Cir. 2006) (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)).  Thus, even if the challenged comments were improper, habeas relief is available only where the comments "were so flagrant as to render the entire trial fundamentally unfair." *Gillard*, 445 F.3d at 897.  When assessing whether an improper comment resulted in a denial of the right to a fair trial, the Court must consider the following factors: (1) the likelihood that the comments misled the jury or prejudiced the accused; (2) whether the comments were extensive or isolated; (3) whether the remarks were deliberately or accidentally presented to the jury; and (4) whether the evidence against the accused was substantial. *Id.*

A review of these factors leads the Court to conclude that the comments at issue did not deprive Petitioner of a fair trial.  The Court does not belief that these comments misled the jury or prejudiced Petitioner.  Furthermore, the Court finds nothing improper about the prosecutor's comments.  The prosecutor did not comment on Petitioner's guilt or innocence, but was instead responding to a statement made by Petitioner's attorney.  Even if the comments were improper, they were brief, isolated, and countered by the judge's instruction to the jury that (a) it was to base its decision only by reference to the evidence and (b) that the attorney's comments did not constitute evidence.  (Trial Transcript at 404-06).  Moreover, there is no evidence that the prosecutor intended to mislead the jury.  Finally, the evidence against Petitioner was overwhelming.  In addition to Teresa Poindexter's testimony, two of Petitioner's children testified that Petitioner beat Teresa Poindexter.  Also, the medical evidence revealed that Teresa Poindexter had been severely beaten.

In sum, the Court finds that the comments at issue (even if improper) did not deprive

Petitioner of a fair trial.  Accordingly, Petitioner's trial counsel was not ineffective for failing to object to such.


    E.    Failure to Convey a Possible Plea Offer

    Petitioner asserts that prior to trial his attorney informed him that during an in-chambers conference, the prosecutor "had offered a reduced plea, but he had rejected it."  (Dkt. #1, Part 3 at 34-35).  Petitioner asserts that his attorney rejected this plea offer "without first checking with defendant."  (Dkt. #1, Part 3 at 35).  Petitioner asserts that by failing to convey a possible plea offer, his attorney rendered ineffective assistance.  (Dkt. #1, Part 3 at 35).

    First, Petitioner offers no evidence as to the existence or terms of this alleged plea offer.  Instead, Petitioner offers only the unsubstantiated statements in his brief.  However, even assuming the existence of such an offer, Petitioner offers neither evidence nor assertion that he would have accepted a plea agreement.  Petitioner has failed to demonstrate that the outcome of his trial would have been different.  Thus, Petitioner has failed to establish that his attorney rendered ineffective assistance by failing to convey a possible plea offer.


    F.    Failure to Present a Complete and Meaningful Defense

    Finally, Petitioner asserts that his trial attorney "failed to present a complete and meaningful defense."  (Dkt. #1, Part 3 at 29).  In support of this argument, Petitioner merely reasserts the five alleged deficiencies discussed above.  Because none of these alleged failures constitute ineffective assistance, Petitioner cannot establish that his attorney failed to present a complete and meaningful defense in violation of Petitioner's right to the effective assistance of counsel.

Even if the Court assumes that Petitioner can establish cause for his failure to present these claims on direct appeal, he cannot demonstrate that he suffered prejudice resulting therefrom because, as discussed above, these particular claims are without merit.  Moreover, Petitioner has failed to demonstrate that the failure to consider the merits of these claim will result in a fundamental miscarriage of justice.  Accordingly, these claims raise no issue upon which habeas relief may be granted.

II.            **Ineffective Assistance of Appellate Counsel**

In his direct appeal as of right, Petitioner asserted that his trial attorney rendered ineffective assistance.  With respect to this claim, the Michigan Court of Appeals concluded:

> Defendant also argues that he was denied the effective assistance of counsel.  We disagree.  In the absence of an evidentiary hearing on this issue, our review is limited to mistakes apparent from the record.  On appeal, defendant merely presents a laundry list of ways in which counsel allegedly was ineffective.  However, defendant fails to provide supporting argument for his claims.  Further, although defendant asserts, "the merit of these issues is clear on the existing record," he does not provide citations to the record or provide the factual basis for his claims.  Accordingly, we conclude that this issue has not been properly presented and we decline to consider it.

*People v. Poindexter*, No. 229096, Opinion at 3 (Mich. Ct. App., Nov. 15, 2002) (internal citations omitted).  Petitioner asserts that his appellate counsel rendered ineffective assistance by failing to effectively assert on appeal his ineffective assistance of trial counsel claims.

While the Court agrees that appellate counsel's attempt to secure review of Petitioner's ineffective assistance of trial counsel claim appears to have constituted deficient performance, Petitioner cannot establish that he was prejudiced by such.  Petitioner has failed to

demonstrate that any of the grounds for ineffective assistance of trial counsel identified in his appellate brief are of merit.  Thus, Petitioner cannot establish that even had the Michigan Court of Appeals reviewed such claims that the outcome would have been different.  Accordingly, these claims present no issue on which habeas relief may be granted.

**III.**          **Prosecutorial Misconduct**

Petitioner asserts that as a result of prosecutorial misconduct he is entitled to habeas relief.  In support of this argument, Petitioner identifies two occurrences discussed in detail above. First, Petitioner asserts that the prosecutor engaged in misconduct by asking Teresa Poindexter, "Why should this jury believe you that he did these - these - what you've testified to as violent acts?" Petitioner also objects to the comments made by the prosecutor during his closing argument in which he stated:

> I hope there's a part of you that says, "Thank God."  "Thank God
> we're here."  "Thank God we get to decide on these charges."

Petitioner did not assert these claims on his appeal as of right, but instead asserted them for the first time in his post-conviction motion for relief.  The state courts refused to consider these claims, however, due to Petitioner's failure to comply with Michigan Court Rule 6.508(D). Because Petitioner has procedurally defaulted these claims, he can obtain review of such by this Court only if he demonstrates either (1) the existence of cause for his default and actual prejudice resulting therefrom, or (2) that the failure to consider the merits of the claim will result in a fundamental miscarriage of justice.

Petitioner can establish neither.  There is no evidence that a fundamental miscarriage

of justice will result from the Court's failure to review the merits of these claims. Petitioner has also failed to demonstrate cause for his failure to properly present these issues. Moreover, even if Petitioner could demonstrate cause, he cannot establish that he suffered prejudice resulting therefrom because, as discussed in detail above, Petitioner's claims of prosecutorial misconduct are without merit. Accordingly, these claims present no issue on which habeas relief may be granted.

**IV.        Failure to Grant Motion for Hearing**

In both his direct appeal as of right and post-conviction motion for relief from judgment, Petitioner requested that he be afforded a *Ginther* hearing.[4] Petitioner asserts that because his requests were denied, he is entitled to habeas relief.

To the extent that Petitioner claims that a decision by a state court to deny his request for a *Ginther* hearing violates Michigan law, such cannot form the basis for habeas relief. *See* 28 U.S.C. § 2254(a) (recognizing that the federal courts can only consider habeas claims alleging violations of the Constitution, laws, or treaties of the United States). To the extent that Petitioner claims that the failure to afford him a *Ginther* hearing violated the Constitution or laws of the United States, the result is the same. As the Sixth Circuit has recognized, there does not exist clearly established federal law providing that "a defendant has a constitutional right to an evidentiary hearing in state court to develop her claim of ineffective assistance counsel on appeal." *Hayes v. Prelesnik*, 193 Fed. Appx. 577, 584 (6th Cir., Aug. 25, 2006). Finally, while this Court has the authority to conduct an evidentiary hearing on this matter, Petitioner has failed to satisfy the requirements to obtain such a hearing. *See* 28 U.S.C. § 2254(e). In sum, this claim raises no issue

---

[4] This is a hearing on a claim of ineffective assistance of counsel. *See People v. Ginther*, 390 Mich. 436 (1973).

28

upon which habeas relief may be granted.

V.        **Sentencing Claims**

Petitioner claims that his "sentence was not proportional to this offense or the offender and the trial court failed to give sufficient reasons for deviation from the guidelines which is contrary to the Supreme Court's recent decision of *Blakely v. United States*." (Dkt. #1, Part 3 at 46). Petitioner asserts that he is, therefore, entitled to habeas relief. Petitioner has failed to exhaust these claims in the state courts. Petitioner's failure to exhaust notwithstanding, the Court may deny such unexhausted claims on the merits. 28 U.S.C. § 2254(b)(2). As these claims are clearly without merit, the Court recommends that they be denied for the reasons articulated below.

A.        Proportionality Claim

Petitioner asserts that his sentence violates the principle of proportionality articulated by the Michigan Supreme Court in *People v. Milbourn*, 461 N.W.2d 1 (Mich. 1990). The Sixth Circuit has observed, however, that because the United States Constitution "contains no strict proportionality guarantee," a claim that the sentencing court violated Michigan's principles of proportionality is not cognizable on federal habeas review. *Lunsford v. Hofbauer*, 1995 WL 236677 at *2 (6th Cir., April 21, 1995) (citing *Harmelin v. Michigan*, 501 U.S. 957, 965 (1991)).

Moreover, the Eighth Amendment to the United States Constitution "does not require strict proportionality between crime and sentence." *United States v. Layne*, 324 F.3d 464, 473 (6th Cir. 2003) (quoting *Harmelin*, 501 U.S. at 1001). Instead, the Eighth Amendment simply forbids extreme sentences that are "grossly disproportionate" to the crime committed. *Layne*, 324 F.3d at

473.  In this case, Petitioner's sentence is in no way "grossly disproportionate" to the crimes he committed.  Thus, these claims present no issue on which habeas relief may be granted.


      B.      Blakely Claim

      Petitioner also asserts that his sentence violates clearly established federal law as articulated in *Blakely v. Washington*, 542 U.S. 296, 301 (2004).

      The United States Supreme Court has held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Blakely v. Washington*, 542 U.S. 296, 301 (2004) (quoting *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000)).  Petitioner asserts that his sentence violates this rule because the trial court, in fashioning his sentence, relied upon facts which were neither admitted nor proven beyond a reasonable doubt.

      In *Blakely*, the defendant pleaded guilty to second degree kidnaping involving domestic violence and use of a firearm.  *Blakely*, 542 U.S. at 298-99.  In so doing, Blakely admitted "the elements of second-degree kidnaping and the domestic-violence and firearm allegations, but no other relevant facts."  *Id.* at 299.  Washington law provided that the "standard range" to which a defendant, convicted of this particular offense, could be sentenced was 49-53 months.  However, the sentencing court was permitted to impose a sentence in excess of the "standard range" if it found "substantial and compelling reasons justifying an exceptional sentence."  Before imposing an "exceptional sentence," the sentencing court was required to "set forth findings of fact and conclusions of law supporting it."  *Id.*

      The State recommended that Blakely receive a "standard range" sentence of 49-53

months. *Id.* at 300. The sentencing court rejected this recommendation, however, and, finding that Blakely acted with "deliberate cruelty," imposed an "exceptional" sentence of 90 months. *Id.* at 300-01. As the *Blakely* Court recognized, under Washington law, the court "could not have imposed the exceptional 90-month sentence solely on the basis of the facts admitted in the guilty plea," but instead could do so only based on the court's additional determination that Blakely acted with "deliberate cruelty." *Id.* at 304. The Court held, therefore, that this sentence violated Blakely's Sixth Amendment right to trial by jury because it was predicated on facts that were neither admitted by Blakely nor found by a jury. *Id.* at 301-05.

The *Blakely* Court, however, made clear that its holding applied only to "determinate-sentencing schemes" such as that employed by the State of Washington. *Id.* at 308-09. The Court recognized that *indeterminate* sentencing schemes do not run afoul of the Constitution because while such schemes may sanction "judicial discretion" in sentencing, they do not accomplish such "at the expense of the jury's traditional function of finding the facts essential to lawful imposition of the penalty." *Id.* at 308-09. As the Court recognized:

> Of course indeterminate schemes involve judicial factfinding, in that a judge (like a parole board) may implicitly rule on those facts he deems important to the exercise of his sentencing discretion. But the facts do not pertain to whether the defendant has a legal *right* to a lesser sentence - and that makes all the difference insofar as judicial impingement upon the traditional role of the jury is concerned. In a system that says the judge may punish burglary with 10 to 40 years, every burglar knows he is risking 40 years in jail. In a system that punishes burglary with a 10-year sentence, with another 30 added for use of a gun, the burglar who enters a home unarmed is *entitled* to no more than a 10-year sentence - and by reason of the Sixth Amendment the facts bearing upon that entitlement must be found by a jury.

*Id.* at 309.

31

As is well recognized, the State of Michigan employs an indeterminate sentencing scheme. *See, e.g., Embery v. McKee*, 2008 WL 2037286 at *5-6 (W.D. Mich., May 12, 2008); *Gray v. Bell*, 2007 WL 172519 at *3 (W.D. Mich., Jan. 19, 2007); *Cordell v. Warren*, 2007 WL 4287543 at *4 (E.D. Mich., Dec. 5, 2007).  Petitioner was convicted of two counts of third degree criminal sexual conduct, assault with the intent to commit great bodily harm less than murder, and extortion. Petitioner was also convicted of being an habitual offender.

Pursuant to Michigan law, a person convicted of third degree criminal sexual conduct may be incarcerated "for not more than 15 years." Mich. Comp. Laws § 750.520d(2).  Michigan law provides that a person convicted of assault with the intent to commit great bodily harm less than murder may be incarcerated for "not more than 10 years."  Mich. Comp. Laws § 750.84.  Under Michigan law, a person convicted of extortion may be incarcerated for "not more than 20 years." Mich. Comp. Laws § 750.213.  Furthermore, because Petitioner was also convicted of being an habitual offender, the sentencing court was permitted under Michigan law to sentence Petitioner to "a maximum term [of imprisonment] that is not more than 1-1/2 times" the maximum sentence otherwise permitted.  Mich. Comp. Laws § 769.10(1)(a).

As previously noted, Petitioner was sentenced to the following concurrent terms of imprisonment: (a) 107-270 months for each of the criminal sexual conduct convictions; (b) 71-180 months for the assault with the intent to commit great bodily harm less than murder conviction; and (c) 118-360 months for the extortion conviction.  The maximum terms of these sentences each represent "1-1/2 times" the maximum sentence otherwise allowed.  Thus, when Petitioner committed these particular crimes he knew that he could possibly receive sentences of this magnitude.

To the extent that the sentencing court engaged in any fact-finding, such was relevant

to a determination of the *recommended* sentence under the state's sentencing guidelines.  In imposing sentence, the court did not deviate from the guidelines recommendation.  However, even had the court chose to depart from the recommended sentence such would be of no consequence because the fact of Petitioner's conviction authorized the imposition of the sentence imposed, without the necessity of the sort of additional fact finding that was found unconstitutional in *Blakely*.  Thus, Petitioner's claim that he was improperly sentenced on the basis of facts found by the trial court rather than a jury is without merit.

## VI.        Confrontation Clause Claim

Petitioner asserts that he was denied his Sixth Amendment right to confront his accusers.  (Dkt. #1, Part 3 at 53).  Petitioner has failed to exhaust this claim in the state courts. Petitioner's failure to exhaust notwithstanding, the Court may deny this claim on the merits.  28 U.S.C. § 2254(b)(2).  As this claim is clearly without merit, the Court recommends that it be denied for the reasons articulated below.

The Court does not dispute that Petitioner has the right under the Constitution to confront the witnesses against him.  Petitioner, however, has identified no witness which he was not permitted to cross-examine at trial.  To the extent that Petitioner seeks relief based upon the Supreme Court's decision in *Crawford v. Washington*, 541 U.S. 36 (2004), the result is the same.

In *Crawford*, the Court concluded that testimonial statements of absent declarants are admissible under the Confrontation Clause only if the declarant is unavailable and the defendant had a prior opportunity to cross-examine the declarant.  *Id.* at 42-69.  However, the *Crawford* decision was not issued until 2004, after Petitioner's conviction became final.  The Supreme Court has since

33

declared that its *Crawford* decision does not apply retroactively to convictions which were final prior to its issuance. *See Whorton v. Bockting*, 127 S.Ct. 1173, 1181-84 (2007).

Petitioner has failed to identify any hearsay statements that were admitted against him in violation of the rule articulated in *Crawford*. Moreover, even if any such statements had been admitted, Petitioner is not entitled to relief under *Crawford* because it may not be applied retroactively to Petitioner. The Court concludes, therefore, that this claim presents no issue upon which habeas relief may be granted.

## CONCLUSION

For the reasons articulated herein, the undersigned concludes that Petitioner is not being confined in violation of the laws, Constitution, or treaties of the United States. Accordingly, the undersigned recommends that Poindexter's petition for writ of habeas corpus be **denied**.

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within ten (10) days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,

Date: November 25, 2008

  /s/ Ellen S. Carmody
ELLEN S. CARMODY
United States Magistrate Judge